IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CALLAHAN TOWER JOINT VENTURE,
and FRANK and BETTY BURR,
Husband and Wife                                          PLAINTIFFS

          v.              Civil No.  07-5214

BENTON COUNTY, ARKANSAS, et al.                           DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Among the claims asserted by the plaintiffs in this action is a claim under the Federal Telecommunications Act based on the defendants' denial of a permit for the construction of a wireless facility for telecommunications services.  Pursuant to 47 U.S.C. § 332(c)(7)(B)(v), this claim is to be reviewed on the written record.  Pursuant to the Court's directive, the parties submitted a stipulated written record and briefs on the issues presented. The matter is now ripe for review and the Court finds and orders as follows with respect thereto:

### BACKGROUND

1.   The plaintiffs in this action are Callahan Tower Joint Venture (hereinafter "Callahan") and Frank and Betty Burr.  The defendants are Benton County, Arkansas, the Benton County Planning Board (hereinafter "the Planning Board"), and the Benton County Appeal Board.

2.   Plaintiff Callahan is an entity which installs and maintains wireless communications facilities, commonly referred to

-1-

as "cellular towers" or "personal wireless facilities."

Plaintiffs Mr. And Mrs. Burr own property in an unincorporated

area of Benton County which they have leased to Callahan for the

purpose of building a personal wireless facility on the property.

The parties refer to the property at issue as the "Wehmeyer

Property."

3.    Benton County Ordinance No. 0-2003-42 governs the

installation of antenna arrays and communication towers.  This

ordinance provides:

> ARTICLE 10.   Preference for Co-Location....   All
> applicants seeking permission to construct a tower in
> order to serve one or more specific purposes must
> demonstrate in the application process that they had
> made a reasonable and good faith effort to co-locate
> their antenna arrays on existing towers or support
> structures. This paragraph does not apply to Applicants
> who desire to construct a tower for the primary purpose
> of attracting other persons to co-locate on the tower.

> ARTICLE 11.  Set back from road.  All towers shall be
> set back from the nearest edge of all roads ... by at
> least 50 feet plus the height of the tower....  Due to
> topographic or other natural features[,] the Planning
> Board may grant a variance for the additional 50' (sic)
> feet.  Wherever possible, towers must follow the full
> setback requirements.

> ARTICLE 18.  Opportunity for Public Response.... [A]ll
> landowners of record owning land within 300 feet of the
> base of the tower and all landowners of record owning
> property adjacent to the parcel of land on which any
> proposed tower ... is to be placed, must be notified in
> writing and given a chance to voice opposition or
> support for a proposed tower or antenna array at a
> public meeting....  In addition to the foregoing notice
> requirements, any time a variance from any of the
> requirements in these regulations is sought, all persons
> owning land within the height of the tower plus 50 feet

> from the base of the tower must be notified of the
> requested variance, and be given an opportunity to
> respond to the request.

(Doc. 13 Ex. 1) (emphasis added)

4.   On June 26, 2007, a Callahan representative filed a project application with the Planning Board for the installation of a wireless communications facility – a 195 foot monopole tower -- on the Wehmeyer Property.  (Stip. Rec. at pg. 1.)  Callahan sought to construct the tower to attract wireless carriers and to host a wireless communications facility for Verizon Wireless Tennessee Partnership (hereinafter "Verizon"), "a leading national provider of personal wireless communications services and a new entrant into the local market."  (Doc. 13 at pg. 6.)  Along with the project application, Callahan submitted a request for a variance from the Benton County ordinance's requirement that the tower be set back from the road 50 feet plus the height of the tower.  (Stip. Rec. at pg. 2.)   The matter went before the Planning Board at a public hearing on July 18, 2007.

### July 18, 2007 Planning Board Meeting

5.   At the July 18th meeting, a Callahan representative testified that cellular service coverage maps submitted with the project application depicted gaps in wireless service for the areas surrounding the Wehmeyer Property.   The Callahan representative explained that the Wehmeyer Property was specifically chosen to address these coverage gaps and that the

proposed tower could only be located within a certain 1,700 square foot window in the area surrounding the Wehmeyer Property.  (Id. at pg. 51.)  The Callahan representative testified that Verizon would have preferred to utilize an existing tower, but that was not feasible because the nearest tower – owned by Cox Communications – was already overloaded.  (Id.)  This fact was confirmed by correspondence from an attorney representing Verizon. (Id. at pg. 30.)  With regard to the variance request, the Callahan representative explained that they were seeking a variance from the set-back requirement because a deep ravine ran through the property, making it impossible to place the tower further from the road.  (Id. at pg. 51.)

6.    Neighboring property owners who opposed construction of the tower on the Wehmeyer Property voiced concerns about the tower being an "eyesore" and about it decreasing residential property values in the area.  Neighboring property owners also pointed out that the property was subject to restrictive covenants which stated that property could be used only for residential purposes.

7.    The Benton County Planning Office Staff recommended approval of the project and variance application, noting that they do "not enforce covenants."  (Id. at pg. 50A.)  The Planning Board, however, denied the application by a vote of three against two.  (Id.)

**August 30, 2007 Appeal Board Meeting**

8.    Callahan appealed the Planning Board's decision to the Benton County Appeal Board (hereinafter the "Appeal Board").  At the Appeal Board hearing on August 30, 2007, one member of the Planning Board testified that while the restrictive covenants had "something to do with" the Planning Board's denial of the application and variance, the "big reason" he voted against it was his misunderstanding regarding the fall-zone of the tower. Callahan presented a letter from the manufacturer of the tower, explaining that the fall zone for the 195 foot tower was actually a radius of less than 90 feet, as the tower is designed to collapse.  (Id. at pg. 264.)  The Planning Board member testified that had he understood this at the Planning Board meeting, he "probably" would have voted to approve the application and variance.  (Id. at pgs. 102-03.)

9.    The Appeal Board opened the meeting up for public comment and again neighboring property owners raised the issue of restrictive covenants and concerns about diminished property values and "hav[ing] these big towers in the[ir] backyard[s] with the big winking lights and so on and so forth."  (Id. at pg. 130.) A couple of property owners suggested that there were other nearby properties on which the tower could be built or another tower available for Verizon to co-locate.  A Callahan representative responded, explaining:

That tower's owned by Cox Communications.  Our client, Verizon Wireless, of course[] they attempted to go on that tower first.  That would be the most logical thing to do.  This is a great, huge expense for them to build their own tower, plus a giant delay in the process....  The owners of the tower issued them a letter saying that it would not pass structural engineering standards to [add] more weight to that tower at the level they needed to....

The coverage in the area is ... very poor at best....  [T]his is very scientifically designed through a very long process.  And you can see [from the coverage maps] how it's not only the best property for that area, but that it also is very dependent on the towers that are already around it existing and how they cover.  So there are several factors into it.  It's not just, you know, what space is available six miles away....

We have looked at several [other site locations]....  [A]cross the road ... [e]nvironmental studies were done, and we were told, "look elsewhere.  It's not going to work here." ... One of the things that this tower will also do is to cover the Highway 71 corridor, right through Bella Vista there, and the further you push the tower to the east, it will not cover that corridor.  And that is one of the areas that the cell carrier is trying to cover....  By moving it half a mile or three quarters of a mile, the carrier would not be able to cover that area.

(Id. at pgs. 118-26.) Callahan also presented testimony from a real estate agent, opining that the tower would not affect property values.  (Id. at pgs. 133-34.)

10.  In light of the testimony of the Planning Board member that he would have voted to approve the project and variance application had he not misunderstood the fall-zone of the tower and in light of the fact that the application was denied by only a three to two vote, with two members of the Planning Board being

absent, the Appeal Board decided to remand the matter to the Planning Board for further consideration.  (Id. at pgs. 71-75.)

### September 19, 2007 Planning Board Meeting

11.  Upon remand to the Planning Board, Callahan restated its arguments in favor of the project and variance application and neighboring property owners restated their arguments against it. With regard to the restrictive covenant issue, Planning Board members commented that the covenants were a "civil matter" and that the Board "should [not] attempt to enforce" them.  (Id. at pg. 144.)  By a vote of five against one, the Planning Board approved the project and variance application, with two conditions:

* that Callahan submit "substantial evidence" that co-location on one of the nearby towers is not feasible; and

* that Callahan pay to repair any road damage caused during construction of the tower.

(Id.)

12.  To comply with these conditions, Callahan submitted documentation from the Federal Communications Commission Antenna Structure Registration records showing only one possible tower for co-location in the area – the nearby Cox Communications tower, which had denied Verizon's request to co-locate.  (Id. at pgs. 31-33.)  Callahan also submitted a letter of assurance to the

-7-

Planning Board regarding payment of costs for any road damage caused by construction of the tower.  (Id. at pg. 266.)

## October 22, 2007 Appeal Board Meeting

13.  Neighboring property owners appealed the Planning Board's approval of the project and variance application.  At the October 22nd Appeal Board meeting, neighboring property owners again voiced their objections to the project based on restrictive covenants, aesthetic concerns, etc.  They also presented an affidavit from an individual who owned commercial property approximately one mile away from the proposed site stating that he would be willing to lease a portion of his property for construction of the tower.  (Id. at pgs. 181-82.)  With regard to the site location that was allegedly unavailable to Callahan due to environmental issues, neighboring property owners submitted correspondence from state and federal agencies indicating that environmental issues "would not necessarily prevent this property from being used as a site for a cell tower."  (Id. at pg. 183.)

14.  The issue of Callahan's efforts to co-locate on another tower was also addressed at the Appeal Board meeting.  An attorney representing the Planning Board noted that the applicable ordinance did not require an effort to co-locate if the applicant was seeking "to construct a tower for the primary purpose of attracting other persons to locate on the tower."  (Id. at pg. 236.)  The attorney opined that he, therefore, was "not even sure

[Callahan was] obliged to meet a co-location requirement," because Callahan was "simply building a tower to attract somebody else's antennas."   (Id. at pgs. 236-37.)

15.   The Appeal Board, without any discussion or stated reasoning, voted, two to one, to overturn the Planning Board's approval of the project and variance application.   The Appeal Board subsequently issued a two-paragraph written opinion reasoning, "[T]here are other less intrusive placement locations that may be available which would service the same geographic area, and ... no convincing evidence was presented for the Appeal Board to grant a variance."   (Id. at pg. 254.)

**DISCUSSION**

16.   The Telecommunications Act of 1996 (hereinafter "the TCA"), under which the jurisdiction of this Court is invoked, was intended by Congress to foster competition among telecommunications providers, to improve the quality of their services, and "to encourage the rollout of new technologies without delay."   USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of Des Moines, 465 F.3d 817, 820 (8th Cir. 2006) (citing City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)).   "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers."   Abrams, 544 U.S. at 115.

But in the TCA, Congress specifically preserved the authority of local zoning boards "over decisions regarding the placement, construction, and modification of personal wireless service facilities," subject to some limitations. 47 U.S.C. § 332(c)(7)(A). Among these limitations is a requirement that a decision like the one at issue here, denying permission to construct a cellular tower, "be in writing and supported by substantial evidence contained in a written record." Id. § 332(c)(7)(B)(iii). The TCA gives federal courts jurisdiction to review such decisions. Id. § 332(c)(7)(B)(v).

17. The Eighth Circuit has interpreted Section 332's substantial evidence standard in accordance with the traditional standard employed by federal courts in reviewing a federal agency action. See USCOC of Greater Iowa, 465 F.3d at 821. Under this traditional standard of review:

> [W]e cannot substitute our determination for that of the administrative fact-finder just because we believe that the fact-finder is clearly wrong.... If the Board's findings are []supported by some substantial level of evidence[] (but less than a preponderance) on the record as a whole ([][c]ontrary evidence may not simply be ignored on review[]) so that a reasonable fact-finder could reach the same conclusion as did the Board, the Board's decision must be affirmed.... We will not reject the Board's decision as unsupported by substantial evidence because there exists []the possibility of drawing two inconsistent conclusions from the evidence.[]

Id. at 821-22 (internal quotations and citations omitted).

-10-

18.   Various issues were raised throughout the course of the proceedings before the Planning Board and Appeal Board concerning aesthetics, property values, restrictive covenants, alternative sites, and co-location on another tower.   However, in its final written decision, the Appeal Board made no actual factual findings regarding these issues.   The Appeal Board simply concluded in a summary fashion that "less intrusive placement locations ... may be available," and that there was no convincing evidence supporting a variance.   The Court will address each of these conclusions in turn.

19.   With regard to the Appeal Board's first conclusion, the applicable Benton County Ordinance does not require an applicant to demonstrate that less intrusive sites are not available.   The Appeal Board's conclusion in this regard, therefore, does not constitute substantial evidence supporting the Appeal Board's decision overturning the Planning Board's approval of the project and variance application.   See New Par v. City of Saginaw, 301 F.3d 390, 398 (6th Cir. 2002) (denial of variance based on rationale that tower could be placed elsewhere was not based on any criteria in relevant city ordinance and, thus, was not supported by substantial evidence); AT&T Wireless Servs. of Cal., LLC v. City of Carlsbad, 308 F.Supp.2d 1148, 1163 (S.D. Cal. 2003) (denial of permit because alternative locations had not been exhaustively explored was not supported by substantial evidence,

as applicable city policy contained no such criteria); Group EMF, Inc. v. Coweta County, 131 F.Supp.2d 1335, 1343 (N.D. Ga. 2000) (county's denial of permit to build cellular site due to applicant's failure to consider alternative cellular sites was not supported by substantial evidence because local ordinance imposed no such requirement).

To the extent that the Appeal Board's conclusion may have been based on the ordinance's requirement that applicants make good faith efforts to co-locate on existing towers, the ordinance specifically provides that this requirement does not apply "to Applicants who desire to construct a tower for the primary purpose of attracting other persons to co-locate on the tower."  (Doc. 13 Ex. 1.)  As pointed out by the Planning Board's own attorney at the second Appeal Board meeting, Callahan was seeking to construct the tower for this very purpose – to attract wireless carriers, including Verizon.  Thus, the ordinance's co-location requirement was not applicable and any evidence relating to a lack of co-location efforts cannot and does not constitute substantial evidence supporting the Appeal's Board's decision.

20.  The Appeal Board's other rationale for overturning the Planning Board's approval of the application was that there was no convincing evidence supporting a variance.  The applicable ordinance provides that, "Due to topographic or other natural features[,] the Planning Board may grant a variance" from the

road-set-back requirement.  (Doc. 13 Ex. 1.)  Callahan submitted

evidence and testimony demonstrating that a deep ravine ran

through the Wehmeyer Property, making placement of the tower

further back from the road impossible.  There was no evidence

submitted contradicting this fact.  The Planning Board credited

this evidence and granted the variance.  However, it appears that

the Appeal Board ignored this evidence, without stating any reason

for doing so.  This is impermissible.  See Snet Cellular, Inc. v.

Angell, 99 F.Supp.2d 190, 195 (D. R.I. 2000) (where applicant's

evidence is uncontroverted, the Board must provide a good reason

for  rejecting  it);  see  also  Omnipoint Communications  MB

Operations, LLC v. Town of Lincoln, 107 F.Supp.2d 108, 115 (D.

Mass. 2000) (same).  The Court, therefore, finds that the Appeal

Board's conclusion regarding the lack of proof supporting a

variance is not supported by substantial evidence.

21.  The  Benton  County  defendants  argue  that  public

opposition to the tower, aesthetic concerns, and the impact on

property values support the Appeal Board's decision.  However, as

noted above, the Appeal Board did not make any findings regarding

these issues and did not base their decision on them.  "Post-hoc

rationales cannot serve as substantial evidence."  USOC of Greater

Iowa, Inc. v. City of Bellevue, Neb., 279 F.Supp.2d 1080, 1087 (D.

Neb. 2003).  Further, generalized concerns regarding aesthetics

and  property  values  have  been  held  to  be  insufficient  to

constitute substantial evidence supporting the denial of an application.  Id. at 1086-87; see also New Par, 301 F.3d at 398-99.

**CONCLUSION**

22.  Based on the foregoing, the Court concludes that the Appeal Board's decision overturning the Planning Board's approval of the project and variance application is not supported by substantial evidence.  Accordingly, the Appeal Board's decision is hereby **VACATED** and the Planning Board's approval is hereby **REINSTATED**.  Defendants shall have thirty days from the date of this order in which to issue all necessary permits for construction of the wireless facility on the Wehmeyer Property.

23.  Count IV of plaintiffs' complaint – a claim for review under Ark. Code Ann. § 14-17-211 – is rendered moot by the Court's disposition of Plaintiffs' TCA claim.  Accordingly, Count IV of plaintiffs' complaint is hereby **DISMISSED.**

24.  Counts II and III of plaintiffs' complaint are claims for damages under 42 U.S.C. § 1983 for alleged violations of plaintiffs' due process and equal protection rights.  In their brief addressing plaintiffs' TCA claim, defendants argue that these claims are subject to dismissal.  Any such arguments should be made via a motion to dismiss.  Defendants shall have ten days from the date of this order to file such a motion.

IT IS SO ORDERED this 24th  day of July, 2008.


/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE